**Max and Mary MARSHALL, et al., Respondent/Appellant,**

**Raintree Lake Property Owners Association, Inc., Respondent/Appellant,**

v.

**PYRAMID DEVELOPMENT CORP., Appellant/Respondent.**

**No. WD 46358.**

Missouri Court of Appeals, Western District.

May 18, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 1993.

Ronald Gregory Byers, Independence, for appellants.

Joe F. Willerth, Independence, Joseph A. Hamilton, Pleasant Hill, for respondents.

Before ULRICH, P.J., and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

Fourteen individuals who are owners of real estate within the Raintree Lake Subdivision and the Raintree Lake Property Owners Association are petitioners in a lawsuit seeking a declaration interpreting certain provisions of the subdivision's covenants, conditions and restrictions and a determination of the authority of the Board of Directors of the Raintree Lake Property Owners Association (Association) to institute increases in assessment charges against all property owners and specifically, the defendant without a vote of the owners.

The petition for declaratory judgment was filed by fourteen individuals (homeowners) who are owners of real estate within Raintree Lake Subdivision, a subdivision located partially in Jackson County and partially in Cass County, Missouri. An initial defendant and now plaintiff, the Association is a not-for-profit corporation, organized and existing for the purpose of enforcement of covenants, collection of annual assessments and review of architectural control. The defendant, Pyramid Development Corp. (Pyramid or developer), is

a Missouri corporation whose corporate charter has been forfeited. Pyramid was represented at trial by its president and Corporate Trustee, Paul Roberts. Pyramid is the successor to Raintree Investors, Limited, a Missouri Limited Partnership, and Raintree Development Corporation (declarant), who was the party who initially filed the covenants, conditions and restrictions.

The homeowners and the Association sought a judicial declaration in Count I, whether the Class C membership status of Pyramid had terminated.[1] The ownership of the Raintree Lake subdivision was divided into Class A lots (single family) owned by individuals who are owners other than defendant, Pyramid; Class B units (multifamily residential units and commercial units) owned or occupied by individuals or corporations other than defendant, Pyramid; and a Class C member who is the developer, which at this time is the defendant, Pyramid. The plaintiffs' claim was grounded in the 1984 amendments of Article IV of the covenants, conditions, and restrictions. These amendments state that Class C membership shall cease and be converted to Class A or B membership when the total number of votes outstanding in the Class A and Class B membership equal the total votes outstanding in the developer's Class C ownership. On October 24, 1990, the trial court held that the number of Class A lots and Class B units owned by private individuals or owners other than Pyramid were 844, and the lots owned by Pyramid numbered 278. On the basis of this finding, the court terminated the Class C voting rights and membership status of defendant Pyramid and the Class C property was converted to Class A or Class B status, as appropriate. Further, the court held that the Board of Directors (the Board), rather than having seven members appointed by the Class C member and one each elected by Class A and Class B members, should be elected as follows: three directors by Class A members; three directors by Class B members; and three directors jointly by Class A and Class B

members, beginning at the annual meeting of March, 1991, and at each annual meeting thereafter. The court also held that the Architectural Review Board should no longer be appointed by the Class C member. The trial court entered its order March 21, 1991, on Count I and that judgment has not been appealed and is the law of the case. The ruling shifted control of the Board from Pyramid to the Class A and B homeowners.

On Count II, following a bench trial, the court held that Pyramid was personally liable for annual assessments on certain lots effective January 1, 1991 in the sum of $74,567.40 and for annual assessments for 1992 and subsequent years on platted or occupied lots. On Count III, the court held that the Board's increase in the annual assessment for 1991, should have been limited to the Consumer Price Index (CPI) rise. Finally, the court found that the lien for the amounts due on each lot owed by the developer would not be due until sale to another or it would be stayed for a period of thirty-six months. The matter was designated final for purposes of appeal, leaving pending the defendant's counterclaim.

The first issue is whether the court's Count II ruling terminating Pyramid's Class C status and conversion of its lots to Class A and B status obligates Pyramid for annual assessments on platted, but unsold, lots for 1991 and subsequent years, and, if so, at what point in time does the obligation commence? Count III presents a question of the authority of the Board of Directors of the Association to increase the assessment of all owners in an amount greater than the rise in the annual CPI without a vote of the members.

The Association and the homeowners find their authority to impose assessments on the developers' platted and unsold lots in Section 4 entitled, "Maximum Annual Assessment." On the other hand, the defendant contends nothing in the Declaration or its amendment can be interpreted to

1. Count I was severed from the counts now on appeal and judgment entered before the trial on Counts II and III.

require it to pay annual assessments as the trial court has ordered.

Pyramid first complains that there is no substantial evidence to support the trial court's Count II declaration holding it liable for annual assessments on platted, but unsold, residential lots. Although Pyramid couches its claim of error in terms of the lack of substantial evidence to support the court's decision, its claimed error is more accurately described as one directed to the trial court's legal interpretation of the restrictive covenants in the document entitled, "Declaration of Covenants, Conditions and Restrictions" (Declaration) together with the amendments. The Declaration regulates the relationship of the real estate developer to its subdivision, as well as the purchasers of property. Our review is according to *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

■■■ The judgments of the trial court are to be accorded considerable deference when its decision turns on factual determinations. Rule 73.01(c)(2); *Trenton Trust Co. v. Western Surety Co.,* 599 S.W.2d 481, 483 (Mo. banc 1980). On the other hand, we make our own independent evaluation of the trial court's declaration and application of the law. *State ex rel. Igoe v. Bradford,* 611 S.W.2d 343, 350 (Mo.App.1980).

Section 4 of Article VI of the Declaration entitled *Maximum Annual Assessment* is set out in part as follows:

> Beginning January 1, 1975, and until January 1, 1978, the maximum annual assessment, *as determined by the Board of Directors of the Association,* shall be One Hundred Eighty Dollars ($180.00) for each Lot, One Hundred Sixty Dollars ($160.00) for each Commercial Unit, One Hundred Twenty Dollars ($120.00) for each Multi–Family Residential Unit, and Twenty–Five Dollars ($25.00) per acre (and major fraction thereof) for each acre of undeveloped and unplatted land not owned by the Developer; provided, however, that assessments for all Lots, units, and land owned by the Class C member, as defined in Article IV, *shall be assessed* separately from other Lots, units, and land as may be reasonably necessary to provide for the care, maintenance and welfare thereof, without regard to the foregoing maximum annual assessments and without regard to the assessments imposed against other Lots, units, and land.

(Emphasis added).

■■■ The primary rule in the interpretation of a contract is to ascertain the intent of the parties and to give effect to that intent. *Speedie Food Mart, Inc. v. Taylor,* 809 S.W.2d 126, 129 (Mo.App.1991). Where there is no ambiguity in the contract, the intent of the parties is to be gathered from it alone and the court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language as there is nothing to construe. *Wickham v. Wickham,* 750 S.W.2d 544, 546 (Mo.App.1988). The intent of the parties shall be determined from the instrument alone. *Republic Nat. Life Ins. Co. v. Missouri State Bank & Trust Co.,* 661 S.W.2d 803, 808 (Mo.App.1983).

Section 4 provides the Board authority to set the assessment for each lot, unit and piece of land in the subdivision as well as set the maximum that can be assessed. The assessment is fixed for the years 1975 through 1977, and thereafter, as set forth in subsequent subparagraphs of the Declaration, the assessment may be raised either by a vote of the Board in conformance with the rise of the CPI, or if the rise is greater than the CPI, it may be raised by a vote of the membership.

The situation here is factually similar to that found in *Phillips v. Authorized Investors Group, Inc.,* 625 S.W.2d 917 (Mo.App. 1981), and therefore, is helpful in our analysis. The trustees of Lake St. Clair Subdivision sued the defendant, Authorized Investors Group, Inc., to collect unpaid subdivision assessments on property owned by the defendant and developer of Lake St. Clair. Each lot sold in the subdivision was the subject of an indenture and the defendant, as the developer, was the grantor of the indenture. The indenture empowered the trustees to levy assessments against the lots in the subdivision, which they did. Most of the lots sold by the defendant were

on contracts for deeds with the defendant retaining title to the lots until the purchase price was fully paid. No assessments were ever made on the lots where the defendant held title subject to contracts for deed or on unsold lots for the years 1973–1976.

The trustees under the indenture were also the only officers, directors and shareholders of the defendant. In 1976, the property owners elected three new trustees, who were not associated with the defendant developer and they sent notices of assessments to the defendant for the years 1973–1976 and, on all lots owned by the defendant. Defendant refused to pay the assessment and the lawsuit ensued. The court held under the terms of the indenture the trustees had authority to levy assessments against "the respective lots in the subdivision." The court found that the indenture made no provisions to exempt the lots and there was no reason for the court to read in an exemption. *Id.* at 919.

■ Section 4 of Article VI not only sets forth the maximum assessment allowable to be made against the property in the subdivision, but it is also the enabling provision granting the Board the authority to assess the property. Although the authority is couched in terms of the maximum allowable assessment, by clear inference, the section grants the Board authority to assess the property with the only exception being undeveloped and unplatted land owned by the developer. Throughout Article VI, a number of references are made to the Board's authority to fix and collect assessments on Class A and B properties. It appears that the only exception to the Board's authority to assess is for acreage owned by the developer, and if the property is undeveloped and unplatted. The words "not owned by the developer," apply only to the undeveloped and unplatted land, and the qualifying words are not applicable to the enumerated items of property, i.e., lots, commercial units, multi-family residential units. The section sets out four separate categories and only the last one acreage is modified to exempt the developer. If the declarant had intended to exclude itself entirely from assessments on the lots and units owned by it, the declarant had only to make the words not owned by the developer applicable to all categories of property. All property, other than undeveloped and unplatted land, under the plain reading of the section, is subject to the Board's control to assess. This sole exception lends support to the petitioner's position that the other property designated Class A and B is assessable by the Board.

There is another consideration that supports this construction. Section 10 of the Declaration providing for exempt property sets forth a number of properties that the declarant considered appropriate to be exempt from assessments. The property owned by the developer is not included among those exempted. *See Phillips,* 625 S.W.2d at 919 (where the declarant could have easily exempted itself if it had intended to do so).

■ The second part of our inquiry, as framed by the developer, is to determine the effective date that the assessments are to commence. The plaintiffs maintain that the trial court was correct by making the assessments commence at a time of the conversion from Class C status to Class A and B status. The developer argues that Section 7 of the Declaration deals with the commencement of the annual assessments. This section provides that the commencement of the annual assessments begins on January 1, 1975, or "on the first day of the month following the *conveyance* of such Lots, the *occupancy* of Multi–Family Residential or Commercial Units, . . . whichever occurs last."[2] (Emphasis Added). In interpreting contracts, courts presume that the words used are intended to have their natural and ordinary meaning. *St. Louis Un-*

---

**2.** Article VI, Section 7; *Date of Commencement of Annual Assessments*

The annual assessment provided for herein shall commence as to all Lots, units or other land heretofore enumerated on January 1, 1975, or on the first day of the month following the conveyance of such Lots, the occupancy of Multi–Family Residential or Commercial Units, and the conveyance of undeveloped and unplatted acreage not owned by the [Pyramid], whichever occurs last.

*ion Trust Co. v. Tipton Elec. Co.,* 636 S.W.2d 357, 359 (Mo.App.1982). Section 7 is a clear expression of the date an assessment is to commence. Obviously, this section was drawn to handle the usual transfers of property under the circumstances existing when Pyramid and its predecessors were platting, developing and selling the land to prospective home owners. In those situations the Class C member (the developer) conveyed property to prospective buyers, which converted the property to either Class A or B status. Nevertheless, the purpose of the section accommodates what has occurred here. The Board's action, by operation of the terms of the Declaration, has converted or reclassified the status of the property. Missouri law recognizes the validity of classification changes. *See Sanderson v. Hidden Valley Fishing Club, Inc.,* 743 S.W.2d 486 (Mo.App.1987). However, the developer's lots have not been "conveyed" or "occupied." The developer's obligation to pay the assessments arises not from the fact of ownership alone but additionally, from the manner or means that defendant acquired the property. Section 7 prohibits the commencement of the assessment until the developer's property is conveyed (residential lot), or occupied (multi-family or commercial unit).

■ The defendant next complains that there was no evidence to support the trial court's ruling that defendant was notified in writing as required by Article VI, Section 7 of the Declaration when the Board held the defendant liable for annual assessments on platted, but unsold residential lots for 1991. Additionally, in the defendant's final point, it complains that the trial court's order has limited the stay of collection of the assessments on the developer's lots for a thirty-six month period if they have not been sold in the interim. The defendant contends the "stay" should be until the lots are sold in conformance with Section 7. The plaintiffs' agree with the defendant that the court had no authority to stay collection for thirty-six months. Both of these points are moot considering our holding that the assessments cannot commence until the developer conveys the lots· or the units are occupied.

■ The Raintree Property Owners Association has appealed the trial court's ruling on Count III. The Association complains of the trial court's action in limiting an increase on all of the lots for the year 1990–91 and subsequent years. The Board raised the assessments on all lots in the full amount of the CPI increase for 1990–91. Additionally, the Board, at its November 1991 meeting, levied an additional $7.00 per month (or $84.00 per year) as an assessment against Class A and B property with a commitment to the homeowners that the money would be set aside from the operating budget for capital improvements and significant maintenance projects. Specifically, the money was to be used for improvements to the swimming pool, tennis courts, common area and silt ponds. It is agreed by the parties that this matter was not submitted for a vote to the full association members.

The Board justified this increase by describing a rather complicated formula with reference not only to the Declaration, but also to the association's bylaws. In essence, the Board said it was going to raise the annual assessments on a cumulative basis on the property, which would be in excess of the CPI for the preceding year.

The motion made at the November meeting was:

> To increase the current dues by the CPI increase of 4.43% for single family lots with an additional $7.00 per month ($84.00 annual) increase to be set aside from the operating budget to be used specifically for capital improvements and significant maintenance projects ... the increase in single family assessments will be appropriately applied to multi-family and acreage assessments.

There is a great deal of evidence for the need of major capital improvements. There was a meeting to discuss special project improvements, including the major repair or replacement of the swimming pool, tennis courts, areas of the Common Area and the silt ponds. A survey was mailed to the association members. The survey asked if the members were in favor of a dues increase to fund the capital improvements and increased maintenance for

the lake and Common Area facilities. An architect was invited to the Board meetings to explain "capital improvement philosophy."

Mr. Roberts testified he had been a member of the Board from 1973 until March 1991, and that at no time did the Board ever exceed the adjustment in any assessment over the CPI for the preceding year and some years, the increase in assessments was not as great as the maximum would have permitted.

The trial court interpreted the Board's action to be two separate and different assessments, the first being the 4.43% equal to the CPI increase and the second, the levying of an additional $84.00 per year to be used for capital improvement projects. The evidence sustains that finding by the trial court. *Murphy*, 536 S.W.2d at 32.

The Board set annual assessments lower than the maximum during periods of high inflation when there were adequate funds available to pay for the ordinary expenses of the Association. It is equally clear that the intent of the drafter of the Declaration intended to limit the Board's power to raise funds to pay for capital improvement projects, by empowering the membership only. Article VI, Section 4(b) states that, in the event the Board desires to raise the assessment without regard to the CPI, a vote of the members must be taken. Section 2(c) of the Declaration specifically provides for special assessments for capital improvements and requires "uniform special assessments against lots, units and acreage, by category, ... for the purpose of defraying, ... cost of any construction, reconstruction, repair, or replacement of a capital improvement upon the Common Area, including fixtures and personal property...." To pass such a special assessment, the Declaration requires a two-thirds attendance of the Class A and B members present or by proxy. The trial court found that the increase in the annual assessment of $84.00 was a special assessment for capital improvements which should have been accomplished under the terms of Article VI, Section 2(c). We agree. The purpose of the funds was for capital improvement. Because there was no vote of the member-

ship, that portion of the increase in annual assessment over and above the CPI, should not have been allowed.

Article VI, Section 4, of the Declaration limits the amount of the annual assessment without a vote of the membership to the CPI for the preceding month of July and the Board is not authorized to accumulate previous unused increases of the CPI. Such an interpretation is clear and obvious from the language of the Declaration. It was the interpretation understood by the Board members over the past years. Where no ambiguity on a contract exists, intent of the parties is to be garnered from the contract itself, and it becomes the duty of the court to state its clear meaning. *Park Lane Medical Center, Inc. v. Blue Cross/Blue Shield*, 809 S.W.2d 721, 725 (Mo.App.1991).

The judgment of the trial court is affirmed except that the assessment for $74,567.40 for 1991 and all subsequent years and the court's order that the judgment constitutes a lien on the property, is reversed. The cause is remanded for entry of judgment in accordance with this opinion and for disposition of defendant's counterclaim.

All concur.