**WOODGLEN ESTATES ASSOCIATION, Respondent,**

v.

**Della Joan DULANEY, Co–Trustee Of The Della Joan Dulaney Trust, et al., Appellant.**

No. WD 73123.

Missouri Court of Appeals, Western District.

Feb. 14, 2012.

Rehearing Denied March 27, 2012.

Dennis J.C. Owens and Jonathan Stern-
berg, Kansas City, MO, for appellant.

Russel M. Nasteff, Kansas City, MO, for respondent.

Before: VICTOR C. HOWARD, P.J., and ALOK AHUJA and KAREN KING MITCHELL, JJ.

ALOK AHUJA, Judge.

Woodglen Estates Association sued Della Joan Dulaney and Everett Dulaney, as co-trustees of the Della Joan Dulaney Trust (collectively "the Dulaneys"), in the Circuit Court of Jackson County, to recover unpaid assessments allegedly owed by the Dulaneys on seventeen undeveloped parcels of land within the Woodglen Estates subdivision. The claims were tried to a jury. After the close of the evidence, the trial court directed a verdict for the Association concerning the Dulaney's liability for the assessments. The jury then awarded the Association damages of $54,500.00 for unpaid assessments and interest. The Dulaneys appeal, arguing that the circuit court erred in granting a directed verdict because their unimproved lots are not subject to assessments, and because the Association failed to follow the procedures specified in the subdivision covenants in imposing and seeking to collect the assessments. We affirm.

**Factual Background**

Woodglen is an association of owners of property in Woodglen Estates, a subdivision in Kansas City. Woodglen Estates consists of thirty-three improved parcels, as well as seventeen undeveloped lots, all owned by the Dulaneys. The subdivision is subject to a Declaration originally executed by developer Braeman Development Company in July 1973, and amended thereafter.

Braeman transferred title to the seventeen undeveloped properties to a company called Lifestyle Development, which in turn transferred them to Crest Financial. The Federal Deposit Insurance Corporation took title to the properties after Crest Financial failed, and sold the properties by quitclaim deed to Everett Dulaney in March 1999. In 2005, he transferred the parcels to the Della Joan Dulaney Trust, of which he and his wife Della Joan Dulaney are co-trustees.

Prior to June 2006, the Dulaneys received no assessment statements from Woodglen, and it appears that no assessments were billed for the seventeen lots prior to the Dulaneys' ownership. In 2006, however, Home Owners Association Services ("HOAS"), a contractor performing administrative services for the Association, conducted an audit and discovered that that the Dulaneys had never paid subdivision assessments. HOAS informed Woodglen of the situation. On June 2, 2006, Woodglen notified the Dulaneys that they owed $69,190 in assessment arrearages from March 1999 through April 2006. HOAS also sent the Dulaneys a coupon book invoicing them for assessments, and followed up with delinquency notices. The Dulaneys never paid, and the Association placed liens on each of their properties.

On July 25, 2008, the Association filed seventeen separate petitions in the Circuit Court of Jackson County against Della Joan Dulaney as trustee of the Della Joan Dulaney Trust, seeking a judgment for the unpaid assessments, and foreclosure of its liens. After the court consolidated the petitions into one case, the Association amended the petition to name both Dulaneys as co-trustees and beneficiaries of the Trust.[1] The Association sought

---

1. The trial court dismissed the Dulaneys, in their capacity as *beneficiaries* of the Trust, at the close of the evidence; this left the Dula-

neys in their capacities as *trustees* of the Trust as the sole defendants. We note that, although they made this argument in the trial

$192,774.56, calculated as $142,785 in principal, and $49,989.56 in interest at 9%. The Dulaneys answered that their parcels could not be assessed under the Declaration, and asserted a counterclaim against the Association, and a third-party claim against HOAS, for slander of title.

The Dulaneys' motions for summary judgment and for judgment on the pleadings were denied. The case proceeded to a jury trial. After the close of the evidence, the circuit court granted the Association's motion for a directed verdict as to the Dulaneys' liability.[2] The jury awarded the Association $54,500 in damages, representing $50,000 for unpaid assessments, and $4,500 in interest. After the Dulaneys' motion for a new trial and remittitur were denied, they appealed to this Court; however, we held that the judgment was not final because the Association's motion for attorneys fees was unresolved. The trial court subsequently awarded the Association $23,071.74 in attorney's fees and $3,269.31 in costs. The Dulaneys again appealed.

### Standard of Review

▇▇▇▇ The trial court generally may not direct a verdict in favor of the party who carries the burden of proof. However, there are exceptions to the rule where the opponent admits the truth of the basic facts upon which the claim of the proponent rests or the proof of the facts is altogether of a documentary nature. If the facts are shown by documents, the documents' correctness and authenticity are not questioned, impeached, or contradicted, and the documents establish facts beyond all doubt showing the proponent is entitled to relief as a matter of

law, then the trial court may direct a verdict in favor of the proponent. This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass. When the grant of a directed verdict is based upon a conclusion of law, we review the trial court's decision *de novo.*

*Mitchell v. Residential Funding Corp.*, 334 S.W.3d 477, 495–96 (Mo.App. W.D.2010) (citations and internal quotation marks omitted).

### Analysis

The Dulaneys challenge the entry of a directed verdict on two grounds. First, they contend that the circuit court erred in finding that their properties are subject to assessments because they are the successors-in-interest to the subdivision's developer, and property held by the developer is not subject to assessments. Second, the Dulaneys claim that the circuit court erred in finding them liable for assessments because the Association failed to follow the procedures specified in the Declaration for establishing and collecting assessments. According to the Dulaneys, the Association: failed to include the Dulaneys' parcels in their annual budgets when proposing assessment increases; failed to give them notice of, and an opportunity to vote at, the meetings at which assessment increases were adopted; and failed to have a court determine the amount of unpaid assessments before seeking to foreclose upon its liens. We find no merit in these arguments, and accordingly affirm.

### I.

▇▇▇▇ The Dulaneys first argue that they are successors-in-interest to the de-

---

court, the Dulaneys do not argue on appeal that the Trust cannot be liable for assessments which became due before the Trust acquired title to the properties in 2005.

2. The parties agreed that the directed verdict also resolved the Dulaneys' affirmative claims.

veloper, Braeman Development Company, and that (among other things) they succeeded to the developer's immunity from subdivision assessments. Like all property owners in the subdivision, the Dulaneys have come to own property previously owned by Braeman. The mere fact that the Dulaneys succeeded to title formerly held by Braeman does not mean, however, that they acquired all of the developer's rights, including any exemption from assessments. As a general proposition, "the developer's rights of a platted subdivision are personal rights that do not run with the land." *Scott v. Ranch Roy–L, Inc.*, 182 S.W.3d 627, 633 (Mo.App. E.D.2005) ("*Scott I* "). While those rights may be assignable, "[i]t is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee." *Id.* at 634 (quoting RESTATEMENT (2D) OF CONTRACTS § 324 (1981)); *see also Scott v. Ranch Roy–L, Inc.*, 242 S.W.3d 401, 406 (Mo.App. E.D.2007) ("*Scott II* ").

Here, the seventeen parcels of undeveloped land the Dulaneys acquired passed through multiple intervening owners prior to the Dulaneys' acquisition: Lifestyle Development, Crest Financial, and the Federal Deposit Insurance Corporation. While the quitclaim deed by which the FDIC transferred the property to Everett Dulaney was admitted into evidence, the Dulaneys cite to no evidence in the record concerning the terms of the transactions by which the property was transferred to the owners intervening between them and the subdivision's initial developer. The only evidence in the record concerning these intervening transactions is Everett Dulaney's trial testimony, in which he merely listed the entities which had previously owned the property. This testimony was insufficient to establish that the original developer, and each successive owner

of the property, manifested an intention to transfer, not just title to the land, but the developer's rights set forth in the Declaration.

■ Even assuming that the Dulaneys did succeed to Braeman's rights as developer under the Declaration, however, the Declaration did not exempt the developer from the assessments generally applicable to all property within the subdivision.

■ "The Declaration regulates the relationship of the real estate developer to its subdivision, as well as the purchasers of property." *Marshall v. Pyramid Dev. Corp.*, 855 S.W.2d 403, 406 (Mo.App. W.D. 1993). "The Declaration is a restrictive covenant between the Developer, the Association, and its members. A restrictive covenant is a private contractual obligation generally governed by the same rules of construction applicable to any covenant or contract." *Wildflower Cmty. Ass'n v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App. W.D.2000) (citations and internal quotation marks omitted). That said, "[r]estrictive covenants are not favorites of Missouri law. '[W]hen interpreting such covenants, courts should give effect to the intent of the parties as expressed in the plain language of the covenant; but, when there is any ambiguity or substantial doubt as to the meaning, restrictive covenants will be read narrowly in favor of the free use of property.' " *Mullin v. Silvercreek Condo. Owner's Ass'n, Inc.*, 195 S.W.3d 484, 490 (Mo.App. S.D.2006) (citing and quoting *Blevins v. Barry–Lawrence County Ass'n*, 707 S.W.2d 407, 408 (Mo. banc 1986)); *see also, e.g., Country Club Dist. Homes Ass'n v. Country Club Christian Church*, 118 S.W.3d 185, 189 (Mo.App. W.D.2003).

The Declaration at issue here does not exempt the developer's property from assessments; to the contrary, multiple provisions state, broadly and without exception,

that both improved and unimproved property within the subdivision is subject to assessment. Thus, the Declaration opens by stating:

> NOW, THEREFORE, in order to assist Developer and its Grantees in providing the means necessary to create, maintain and preserve a residential development of high standard and quality, *Developer does hereby subject all of the property comprising Greenwood Meadows First Plat as heretofore identified to the covenants, charges, and assessments set forth and contained in this Declaration,* subject however to the limitations hereinafter specified.

(Emphasis added.).

The Declaration's Definitions similarly contemplate that owners of undeveloped property would be subject to assessments. The Dulaneys do not contest that the seventeen lots they own constitute "parcels" of land within the subdivision. Although multiple provisions in the Declaration distinguish between owners of *units* (meaning residential buildings constructed on land), and owners of *parcels,* the definition of "Assessment" in the Declaration makes unambiguously clear that the existence of a "unit" on a particular piece of property is not necessary to establish an owner's liability for assessments: it provides that an "assessment" is "[t]hat portion of the cost of maintaining, repairing and managing the property *which is to be paid by each parcel owner.*" (Emphasis added).

Article XI of the Declaration, which specifically addresses assessments, similarly makes clear that liability for assessments attaches to *both* unit *and* parcel owners. It provides in pertinent part:

> 11.1 *Monthly Assessments. Each unit or parcel owner shall pay* to the Board on the first day of each successive month, *such monthly assessments as shall be determined from time to time* in accordance with this Article. . . . .

> 11.2 *Estimate and Payment Dates.* By December 1 of each year, beginning in the year 1973, the Board of Managers shall estimate the total amount necessary to [pay costs and plan for contingencies]. In the event said estimate shall indicate a necessity to increase the monthly assessment to a sum greater than that provided in Paragraph 11.1 aforesaid, then the Board of Managers shall call *a meeting of the unit and parcel owners,* to be held not later than December 31 for the purpose of advising said persons of the needs for the coming year. The amount of the assessment for the ensuing year shall then be established by a vote of the owners assembled at said meeting, a majority of those present to be required to approve said assessment. *Thereafter,* on the first day of each month of the following year, *each owner shall be obligated to pay to the Board such sum as shall have been established at said meeting.*

(Emphasis added). Article I of the Declaration defines "unit owners" as "[t]he owners of all parcels of land containing units of residence." Given this definition of "unit owners," the reference in ¶ 11.2 to "parcel owners," separately from "unit owners," must refer to owners of unimproved land. Moreover, the Declaration defines an "owner" as "[t]he person or persons, individually and collectively, having fee simple ownership of *a parcel*" (emphasis added); thus, the last sentence of ¶ 11.2 imposes an obligation to pay assessments on *all* parcel owners, whether or not a "unit" has been constructed on their property.

█ Admittedly, the Declaration does not explicitly state that parcels *owned by the developer* are subject to assessment. The assessment provisions of the Declaration are nevertheless broad, and general,

enough to comprehend the developer's property. The Dulaneys argue that the Declaration's silence concerning whether the developer's property is subject to assessment requires a ruling in their favor, since—they contend—"a developer generally is not obligated to obey the terms of a declaration applicable to an association member" as a matter of Missouri common law. We disagree. Missouri decisions hold that, where subdivision covenants authorizing assessments are drafted broadly enough to comprehend property held by the developer, and the developer is not expressly exempted from liability for assessments, then the developer is subject to assessments to the same degree as any other property owner. Thus, in *Marshall v. Pyramid Development Corp.*, 855 S.W.2d 403 (Mo.App. W.D.1993), a subdivision Declaration contained the following provision authorizing a homeowners association to make assessments:

> Beginning January 1, 1975, and until January 1, 1978, the maximum annual assessment, as determined by the Board of Directors of the Association, shall be One Hundred Eighty Dollars ($180.00) for each Lot, One Hundred Sixty Dollars ($160.00) for each Commercial Unit, One Hundred Twenty Dollars ($120.00) for each Multi–Family Residential Unit, and Twenty–Five Dollars ($25.00) per acre (and major fraction thereof) for each acre of undeveloped and unplatted land not owned by the Developer. . . .

*Id.* at 406. Like the Dulaneys here, the developer in *Marshall* argued that platted land that it owned was not subject to assessment, despite the lack of any specific exemption of such property from the association's authority to levy assessments. *Marshall* rejected the developer's argument for an unstated exemption:

> [Under the Declaration,] [i]t appears that the only exception to the Board's

authority to assess is for acreage owned by the developer, and if the property is undeveloped and unplatted. The words "not owned by the developer," apply only to the undeveloped and unplatted land, and the qualifying words are not applicable to the enumerated items of property, i.e., lots, commercial units, multi-family residential units. The section sets out four separate categories and only the last one, acreage, is modified to exempt the developer. *If the declarant had intended to exclude itself entirely from assessments on the lots and units owned by it, the declarant had only to make the words not owned by the developer applicable to all categories of property.* All property, other than undeveloped and unplatted land, under the plain reading of the section, is subject to the Board's control to assess. This sole exception lends support to the petitioner's position that the other property designated Class A and B is assessable by the Board.

*Id.* at 407 (emphasis added).

Similarly, in *Phillips v. Authorized Investors Group*, 625 S.W.2d 917 (Mo.App. E.D.1981), a developer argued that, "as the grantor-developer of the subdivision, it could not become liable for assessment unless it specifically agreed to be liable." *Id.* at 920. The Court rejected this argument, and held that covenants which broadly subjected all property in a subdivision to assessments, with no stated exceptions, applied to the developer's property to the same degree as property held by others.

> Paragraph 3 of the indenture governs the assessments. This paragraph gives the trustees authority to levy assessments against "the respective lots in the subdivision." *No lots are exempted and there is no reason for us to read in an exemption. . . . Had defendant in-*

*tended to exempt itself from assessment, it could have easily used explicit language to reflect that intention.* Indeed, it is apparent that defendant realized it had the power to do so. In paragraph 4 of the indenture, the trustees are authorized "to make a charge (except to Grantor) for benefit of subdivision for permits they may grant to extend water or sewer mains. . . ." By this provision, defendant—the grantor—clearly exempted itself from the noted charges. Defendant could have been equally precise in paragraph 3 had it intended to exempt itself from assessment. It did not do so. The language of paragraph 3 is unambiguous. Thus, all lots in the subdivision, including defendant's lots, are subject to assessment.

*Id.* at 919 (emphasis added).

The Dulaneys quote the following passage from a Missouri treatise to bolster their argument for a presumptive exemption of developers from subdivision assessments:

> Developers often desire to avoid assessments on lots they have not yet sold. Liability for such assessments could be substantial, and prior to sale the developer's lots are probably not consuming services provided by the association or otherwise substantially benefiting from its activities.

1 Mo. Pract., Methods of Practice: Transaction Guide § 13.6, at 555 (4th ed.2001). The Dulaneys omit, however, the very next sentence, which explains: "Developers can excuse themselves from assessment obligations, *but the language used should be clear and unambiguous.*" *Id.* (emphasis added; footnote omitted). The treatise supports this statement by citing to *Phillips,* among other cases. Thus, the treatise the Dulaneys cite itself recognizes that there is no "default rule" holding that subdivision developers are necessarily exempt from homeowners association assessments; instead, developers must specify their exemption in the subdivision covenants which they prepare.[3] The developer in this case simply failed to do so.

■ The Dulaneys cite additional provisions of the Declaration, which they contend establish that only unit owners are members of the Association, and that only unit owners are entitled to notice of, and to vote at, the Association's meetings, or to serve on the Association's Board of Managers. We acknowledge that the other provisions the Dulaneys cite appear to contemplate that units would be constructed on each parcel, and the improved parcels sold by the developer, soon after the establishment of the subdivision, and that *only* "unit owners" would exist within the development, and participate in its governance. Still other provisions of the Declaration refer to "unit owners" and "parcel owners" imprecisely: for example, Article IV provides for the future conveyance by the developer of an undivided interest in the Common Elements "to *the owners of each parcel of land* within Greenwood Meadows First Plat," but then provides that the

---

**3.** The treatise cites the following cases in which developers effectively exempted themselves from assessments through language in the subdivision's covenants: *Lake Sherwood Ests. Ass'n v. Continental Bank & Trust Co.,* 677 S.W.2d 372, 375 (Mo.App. E.D.1984) (developer not liable for assessments where " '[o]wners' subject to assessment were defined to be persons who purchased from the developer"); *Baker v. Lake Lorraine, Inc.,* 562 S.W.2d 374, 378 (Mo.App.1978) ("The Deed of Restrictions . . . reads in part: '. . . Grantor shall have the right to assess the owner of these lots after January 1, 1957, . . . such sums as the Grantor may deem necessary for the upkeep and maintenance of the [improvements]. . . .' Clearly this provision contemplated that the grantors assess lot owners and not themselves as grantors.").

parcel owners' ownership share shall be "equal to such percentage ownership as *the number of units owned by him* shall bear to the total units" in the subdivision. (Emphasis added.)

While there may be some ambiguity as to the respective rights of unit and parcel owners *in other contexts*, however, the provisions of the Declaration addressing assessments plainly contemplate the liability of *both* unit owners and parcel owners, and provide a procedure for the establishment of increased assessments in which *both* unit owners and parcel owners are entitled to participate. It is the assessment provisions which are controlling here. *Five Star Quality Care–MO, L.L.C. v. Lawson,* 283 S.W.3d 811, 815 (Mo.App. W.D.2009) ("When a provision of a contract deals with a specific situation, it will prevail over a more general provision if there is ambiguity or inconsistency between them."). We will not import any potential ambiguity or imprecision in *other* portions of the Declaration into its assessment provisions, which are clear and unqualified, and can operate independently of the other provisions the Dulaneys cite. *See, e.g., Mendota Ins. Co. v. Ware,* 348 S.W.3d 68, 74 n. 3 (Mo.App. W.D.2011) (possible ambiguities in insurance policy's property damage provisions irrelevant where suit involved coverage only for bodily injuries).

 Finally, the Dulaneys cite to a provision found in Article XVI, the "Miscellaneous Provisions," which states:

> 16.1 *Effect of Covenants.* Each unit purchaser, upon accepting a deed of conveyance, accepts the same subject to all the provisions of this Declaration and these Bylaws, which shall be deemed to be covenants running with the land and

shall bind all persons having any interest in any unit.

Although parcel owners are not included in this provision, the Dulaneys themselves acknowledge that, as a general rule, purchasers of property take subject to covenants if they have actual or constructive notice that the covenants burden the land. *See, e.g., Hoag v. McBride & Son Inv. Co.,* 967 S.W.2d 157, 168 n. 2 (Mo.App. E.D.1998); *Whispering Valley Lakes Improvement Ass'n v. Franklin County Mercantile Bank,* 879 S.W.2d 572, 574 (Mo.App. E.D. 1994). The fact that the Declaration does not explicitly recite this rule, with respect to parcel owners, does not render the rule inapplicable. Here, Everett Dulaney testified that he was aware of the Declaration when he originally acquired the seventeen unimproved parcels; the Dulaneys do not contend that their properties are not subject to the Declaration as a whole.

Without deciding whether parcel owners such as the Dulaneys are bound to any other terms of the Declaration, the circuit court did not err in holding that they are liable for assessments as a matter of law.

### II.

 In their second Point Relied On, the Dulaneys claim that, even if parcel owners are subject to assessments under the Declaration, the trial court still erred in directing a verdict, because the Association failed to follow proper procedures in establishing, and attempting to collect, their unpaid assessments. Specifically, the Dulaneys argue: (1) that the Association cannot collect assessments from them for periods in which their parcels were not included in the annual budgets used to establish particular assessment increases;[4]

---

**4.** The Dulaneys argue that, prior to 2007, only the thirty-three developed properties were used for purposes of calculating necessary per-parcel assessments. They argue that, if their additional seventeen parcels are also deemed to be subject to assessments, *fifty*

(2) that the Association failed to give them notice of, and an opportunity to vote at, the meetings at which the assessment increases were adopted; and (3) that the Association must have a court determine the amount of their unpaid assessments before seeking to foreclose on its liens.

We need not address the merits of the first two sub-parts of the Dulaneys' second Point. First, the Dulaneys did not make either of these arguments when opposing the Association's oral motion for a directed verdict at the close of the evidence. Instead, they opposed the Association's directed verdict motion solely on three grounds: that only unit owners, not parcel owners, could be subject to assessments (an argument we rejected in § I, above); that the Association had failed to provide them with the delinquency notices required by the Association's own policies (an argument not raised here); and that foreclosure of the Association's liens was premature, since the Declaration requires a prior judicial determination of the amount of any arrearage (an argument we address below). Because the Dulaneys did not make their budgeting and notice arguments in opposing the entry of a directed verdict in the trial court, they may not rely on those arguments here. *See, e.g., BHA Grp. Holding, Inc. v. Pendergast*, 173 S.W.3d 373, 382 (Mo.App. W.D.2005) ("Arguments not presented to the court below are not preserved for appeal." (citation and internal quotation marks omitted)). It would be particularly inappropriate to now permit the Dulaneys to use their budgeting argument to attack the entry of the directed verdict: after the directed-verdict ruling, the Dulaneys specifically sought, and obtained, clarification from the trial court that the directed verdict did not foreclose them from making the budgeting argument to the jury, in order to reduce the Association's recoverable damages. Thus, far from arguing that the budgeting issue should prevent the entry of a directed verdict, the Dulaneys instead suggested to the trial court that the budgeting issue was unaffected by the court's liability determination.[5]

But even if the Dulaneys had preserved these issues, their budgeting and notice arguments could not justify reversal of the directed verdict, which only resolved their *liability* for assessments, not the *amount* of their unpaid assessments. The Declaration establishes a monthly assessment amount of $16.50 per parcel for 1973 and 1974. The budgeting and notice requirements on which the Dulaneys rely apply only "in the event [the Association's] estimate [of the coming year's expenses] shall indicate a necessity to increase the monthly assessment to a sum greater than" the amount established for the 1973

---

properties would now share the burden of the Association's expenses, as opposed to the thirty-three the Association expected at the time, resulting in a substantial windfall to the Association.

5. In addition to the preservation issue discussed in the text, we note that the Dulaneys' budgeting and notice arguments would appear to be affirmative defenses, to the extent those arguments allege that the Association failed to satisfy conditions precedent to the levying of assessments against their property. *River Oaks Homes Ass'n v. Lounce*, 356 S.W.3d 855, 860–62 (Mo.App. W.D.2012) (citing *Brentmoor Place Residents Ass'n v. Warren*, 816 S.W.2d 7, 9 (Mo.App. E.D.1991)). The Dulaneys did not plead these procedural objections as affirmative defenses in their answers to the Association's first amended petition, however, which would generally result in waiver of the arguments (barring an exception to the waiver rule, such as trial of the issues by consent). *See, e.g., Echols v. City of Riverside*, 332 S.W.3d 207, 211–12 (Mo.App. W.D.2010); *Keehn v. Ruzicka Elec. & Sons, Inc.*, 251 S.W.3d 388, 390 (Mo.App. E.D. 2008). Given our disposition we need not definitively resolve this issue.

and 1974. Whether or not the Association complied with the procedures for *increasing* assessments in later years, the Dulaneys would remain *liable* for assessments, at the base amount established in the Declaration itself.

The fact that the Dulaneys' budget and notice arguments go to *damages*, not to *liability*, is confirmed by the fact that their counsel argued to the jury, in closing, that any damage award should be reduced because their unimproved lots were not included in the budgeting process that led to the establishment of increased assessments for 1999 through 2006. We also note that the jury's damage award—which fell below the amounts suggested by *either* party in closing arguments—approximates an award of the $16.50 base amount specified in the Declaration for the years 1999 through 2006, together with the unchallenged assessment amounts for 2007 and 2008. Thus, it appears the jury actually gave the Dulaneys all the relief to which they would be entitled under their budgeting and notice arguments.

 Finally, the Dulaneys argue that the Association did not follow the required procedure to collect arrearages under the Declaration. Section 11.4 provides:

11.4 *Defaults, Collections and Liens.* Should an owner be in default in monthly payment of charges or assessments for thirty (30) days, the Board, in their individual names or as members of such Board, may bring legal action for and on behalf of themselves and as representatives of all owners, to enforce collection thereof or to foreclose the lien therefor, as hereinafter provided. In this event, there shall be added to the amount due, the costs of such suit, together with interest at the maximum rate permitted by law, from the date due, and such attorneys' fees as may be fixed by the Court. The amount found by the Court to be due for unpaid charges or assessments, interest, costs and fees shall become a lien against the parcel and unit of the owner who failed to pay, such lien to be enforced in the Circuit Court of Jackson County, Missouri, or in such other Court or in such other manner as may be provided by law.

Based on this provision, the Dulaneys contend that, before the Association may seek to foreclose a lien for unpaid assessments, a court must determine the amount due. The Dulaneys argue that the Association violated this provision by filing their action to foreclose on its liens, without any prior judicial determination of the amount the Dulaneys owed.

The Dulaneys ignore, however, that, although the Association's First Amended Petition sought foreclosure of its liens, the petition also prayed for a judgment for money damages. The court specifically advised the parties during trial that "the jury's not going to foreclose. The jury's going to assess an amount of money damages that they say that the defendants owe." Consistent with this ruling, the only relief awarded in the court's judgment is money damages, attorneys' fees and costs. In these circumstances, the Dulaneys' argument as to the conditions which must be satisfied before foreclosure of a lien have no relevance to the judgment actually entered, and cannot justify reversal.

### Conclusion

The judgment is affirmed.

All concur.