

# Missouri Court of Appeals
## Southern District
### Division Two

ROBERT J. HELLMANN,
and DEBRA S. HELLMANN,    )
                          )
  Petitioner-Appellants/Respondents,    )
                          )
vs.                       )     Nos. SD32740, SD32742
                          )     and SD32743, Consolidated
RANDY SPARKS, EXECUTIVE VACATION    )
GET-A-WAYS, LLC, JAMES C. RESTELLI,    )
KAREN A. RESTELLI, MITCH'S    )
GREENTHUMB LANDSCAPING CORP.,    )     **Filed:  February 20, 2015**
JEFFREY M. LOWE, KATHLEEN E. LOWE,    )
JAMES RESTELLI, JEFFREY M. LOWE,    )
and ROGER L. FULTON, AS PUTATIVE    )
DIRECTORS OF THE GRAND POINT    )
ISLAND HOMEOWNERS ASSOCIATION,    )
INC., UNKNOWN PERSONS OR ENTITIES    )
THAT CLAIM AN INTEREST IN THE BOAT    )
DOCK KNOWN AS THE"COMMUNITY    )
DOCK" ATTACHED TO THE LOT KNOWN    )
AS THE "PARK" IN GRAND POINTE    )
ISLAND SUBDIVISION, A SUBDIVISION    )
IN CAMDEN COUNTY, MISSOURI,    )
GRAND POINT ISLAND HOMEOWNERS    )
ASSOCIATION, INC., EXCLUSIVE LAKE    )
PROPERTIES, LLC, BAYBERRY    )
DEVELOPMENT CO. II, INC.,    )
ROGER L. FULTON, DEBRA A. FULTON,    )
JEFFREY A. HOWELL, KIM M. HOWELL,    )
                          )
  Respondents-Respondents,    )
                          )
HEALTH CARE RESOURCE, LLC,    )
                          )
  Respondent-Respondent/    )
  Cross-Appellant,    )
                          )

```
                                          )
and ROBERT A. BULL and DEBRA BULL,        )
                                          )
        Respondents-Respondents           )
        /Cross Appellants.                )
```

APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

Honorable Bruce E. Colyer, Associate Circuit Judge

**AFFIRMED**

This case involves certain waterfront real estate located on Lake of the Ozarks in Camden County, Missouri. The property is part of a planned, gated community called Grand Point Island ("the subdivision"). The subdivision is located on an island connected to the mainland by a causeway. From the time the subdivision was created, the subdivision has had a park reserved by deed restrictions for the recreational use of all lot owners in the subdivision and a community dock which is attached to the park. In 2008, Robert Hellmann and his wife Debra Hellmann (collectively "the Hellmanns") purchased some lots in the subdivision. They also acquired the causeway and the park. Thereafter, a dispute arose regarding the location of the community dock and control of the subdivision's homeowners' association, Grand Point Island Homeowners Association, Inc. ("GPI"). A lawsuit followed. In that lawsuit, the Hellmanns asked the trial court to find there was a valid agreement to move the community dock and to find that the current board of directors of GPI did not have authority to act on behalf of GPI. The trial court found against the Hellmanns on all counts, and they appeal. Two other parties, Health Care Resources, LLC ("HCR"), and Robert and Debra Bull ("the Bulls"), cross-appeal.

2

The Hellmanns raise 17 points on appeal which fall into four major groups: points regarding the authority of GPI, points regarding the interpretation of the subdivision's governing documents, points regarding an alleged agreement to move the community dock, and points regarding the appointment of an attorney for unknown parties during the litigation. HCR joins in many of those points and raises four additional points of its own. HCR's four additional points challenge the authority of GPI. The Bulls raise three points related to an easement associated with the agreement to move the dock. For ease of analysis, the points have been grouped together by topic, and we address each topic separately. We affirm the trial court's judgment *in toto*.

## Standard of Review

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." ***Ivie v. Smith***, 439 S.W.3d 189, 198-99 (Mo. banc 2014). "When reviewing whether the circuit court's judgment is supported by substantial evidence, appellate courts view the evidence in the light most favorable to the circuit court's judgment and defer to the circuit court's credibility determinations." ***Id.*** at 200. Questions of law such as contract interpretation are reviewed *de novo*. ***G.H.H. Invs., L.L.C. v. Chesterfield Mgmt. Assocs., L.P.***, 262 S.W.3d 687, 691 (Mo. App. E.D. 2008).

## Points Regarding the Authority of GPI

The first group of conceptually related points involved the authority of GPI and the board of directors of GPI. These points include the Hellmanns' Point I,

3

Point II, Point III, Point IV, and Point V, as well as HCR's Point I, Point II, and Point III. The following facts are relevant to the resolution of these points.

GPI was created in January 2001. In June of the same year, Bayberry Development Company II, Inc. ("Bayberry") filed a declaration of restrictions ("the declaration") for the subdivision. GPI was named the governing body for the subdivision. The declaration gave Bayberry the power to appoint the board of directors of GPI until October 1, 2016, or until Bayberry voluntarily relinquished that right. The declaration further empowered GPI to maintain the subdivision's facilities, *i.e.*, items or things owned or leased by GPI, and levy assessments against the property owners for maintaining and improving the facilities.

Bayberry subsequently began to develop the subdivision and sell lots for residential purposes. Around this time, Bayberry attached the community dock to the park. In 2004, Bayberry sold all the lots in the subdivision which had not already been purchased to Care Investments, LLC ("Care"). On January 5, 2006, GPI was administratively dissolved for failing to file a correct and current annual report. On August 29, 2006, Bayberry was administratively dissolved for failing to file a correct and current annual report.

In early 2008, the Hellmanns began negotiating with Care to purchase a number of lots on the island. The Hellmanns purchased lots 1, 12, and 13, as well as the park and the causeway from Care on April 19, 2008. During this time frame, disagreements arose regarding a plan to relocate the community dock.

Also in April 2008, a second Missouri non profit corporation named Grand Point Island Homeowners Association, Inc. ("Second GPI") was incorporated. After that time, Second GPI spent money on snow removal, storm

4

sewer repair, and some attorneys' fees associated with starting Second GPI. Second GPI also opposed the plan to relocate the community dock.

On May 21, 2010, Robbie Marley, president and sole remaining member of Bayberry, signed a document ratifying the current board membership of the Grand Point Island Homeowner's Association, Inc., to include James Restelli ("Restelli") as President, Jeffery Lowe ("Lowe") as Vice-President, and Roger Fulton ("Fulton") as Secretary/Treasurer. That document did not designate whether the association referred to was GPI or Second GPI.

At some point, Second GPI discovered the existence of GPI. To clarify the situation, the members voted to reinstate GPI and to merge GPI with Second GPI. On April 13, 2011, GPI was restored to good standing with the Office of the Missouri Secretary of State. On May 25, 2011, the board of directors recommended the homeowners merge GPI with Second GPI. On November 14, 2011, the Missouri Secretary of State issued a Certificate of Merger combining the two homeowners' associations leaving GPI as the surviving entity.

In their seventh amended petition, the Hellmanns requested a declaratory judgment stating, among other things, that: (1) Second GPI had no authority to govern the subdivision; (2) all actions taken by Second GPI were void; (3) Bayberry had voluntarily relinquished its rights to appoint directors so the Bayberry consent to the appointment of the board of directors had no force or effect; (4) all actions taken by the board of directors were void; and (5) the reinstatement of GPI was void because Restelli did not have the authority to act on behalf of GPI. In the judgment, the trial court found Bayberry had not relinquished its right to appoint directors, so Restelli, Fulton, and Lowe had been

5

properly appointed directors of GPI. The trial court further found GPI's actions were authorized. In their first group of points on appeal, the Hellmanns challenge these rulings.

### *No Assignment or Ratification Was Necessary*

In their first point, the Hellmanns argue the trial court erred in finding Second GPI "was a validly existing homeowners' association with authority to govern the Subdivision" because Second GPI never received an assignment of rights from GPI. In their third point, the Hellmanns argue the trial court erred when it found the actions of Second GPI were valid. In support of this claim, the Hellmanns state there was no evidence GPI ratified the acts of Second GPI and reiterate their argument that Second GPI had no authority to act because it had never received an assignment. These arguments are incorrect because Second GPI merged into GPI.

Both GPI and Second GPI were limited liability corporations operating under Missouri law. They merged in 2011. Thus, the applicable rule is stated in Section 355.636,[1] which governs the effect of mergers of corporations in Missouri. That section provides as follows:

> When a merger takes effect:
>
> (1)  Every other corporation party to the merger merges into the surviving corporation and the separate existence of every corporation except the surviving corporation ceases;
>
> (2)  The title to all real estate and other property owned by each corporation party to the merger is vested in the surviving corporation without reversion or impairment subject to any and all conditions to which the property was subject prior to the merger;

---

[1] Unless otherwise indicated, all statutory references are to RSMo (2000).

(3)     The surviving corporation has all liabilities and obligations of each corporation party to the merger;

(4)     A proceeding pending against any corporation party to the merger may be continued as if the merger did not occur or the surviving corporation may be substituted in the proceeding for the corporation whose existence ceased; and

(5)     The articles of incorporation and bylaws of the surviving corporation are amended to the extent provided in the plan of merger.

*Id.*

Here, GPI and Second GPI were merged in 2011 with GPI as the surviving corporation.  Consequently, under the plain language of Section 355.636, Second GPI ceased to exist.  § 355.636(1).  The only existing corporation was GPI, which, as the trial court correctly found, had authority to maintain the subdivision facilities.

In support of their arguments to the contrary, the Hellmanns rely on *DeBaliviere Place Ass'n v. Veal*, 337 S.W.3d 670 (Mo. banc 2011), and *Valley View Village South Imp. Ass'n, Inc. v. Brock*, 272 S.W.3d 927 (Mo. App. S.D. 2009), for the proposition that since Second GPI did not exist at the time the declaration was filed, it needed an assignment from GPI for authority to act.

This argument fails because *DeBaliviere* and *Valley View* involved different factual situations.  It is true that in each of those cases, as in the present case, a second homeowners' association began managing a subdivision after a first homeowners' association lapsed.  *DeBaliviere*, 337 S.W.3d at 672; *Valley View*, 272 S.W.3d at 928.  However, those cases are different from the present case because neither of those cases involved a merger of the first homeowners'

7

association with the second homeowners' association. In *DeBaliviere*, the second homeowners' association received authority via an assignment, and in *Valley View* no attempt was made to revitalize the first homeowners' association. *DeBaliviere*, 337 S.W.3d at 672; *Valley View*, 272 S.W.3d at 932. While the second homeowners' associations in those cases were found not to have the necessary authority because they did not receive an assignment of the correct rights from the first homeowners' associations, nothing in those cases requires the conclusion that the only way a successor homeowners' association may acquire rights to govern a subdivision is by assignment. Here, Second GPI was merged into GPI. Through that merger, GPI, which did have authority to govern the subdivision, assumed all liabilities and obligations of Second GPI, thus implicitly ratifying all of Second GPI's actions. *See* § 355.636(3).

The Hellmanns' Points I and III are denied.[2]

### *Directors' Authority*

In their second point, the Hellmanns argue the trial court erred in finding GPI was a validly existing homeowners' association because it had never been properly reinstated or merged with Second GPI because "no authorized representative of [GPI] approved these actions." In their fourth point, the Hellmanns argue the trial court erred when it found "Bayberry did not voluntarily relinquish its rights to appoint directors[.]" In their fifth point, the Hellmanns argue the trial court erred when it found GPI's actions between 2008 and 2011 were valid because the directors were not elected. All three of these points fail

---

[2] The Hellmanns' Point I is substantially the same as Point I in HCR's brief as cross-appellant. We deny HCR's first point for the same reasons we deny the Hellmanns' first and third points.

because Bayberry did not voluntarily relinquish its rights to appoint directors for GPI, so Restelli, Fulton, and Lowe had authority to act on behalf of GPI.

As with so many of the points in this case, the analysis begins with the declaration of covenants for the subdivision. Generally speaking, a declaration of covenants for a subdivision "regulates the relationship of the real estate developer to its subdivision, as well as the purchasers of property." *Woodglen Estates Ass'n v. Dulaney*, 359 S.W.3d 508, 513 (Mo. App. W.D. 2012) (quoting *Marshall v. Pyramid Dev. Corp.*, 855 S.W.2d 403, 406 (Mo. App. W.D. 1993)). That document "is a restrictive covenant between the [d]eveloper, the [a]ssociation, and its members." *Id.* (quoting *Wildflower Cmty. Ass'n v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000)). "The rules governing construction of restrictive covenants on realty are generally the same as those applicable to any covenant or contract." *Stolba v. Vesci*, 909 S.W.2d 706, 708 (Mo. App. S.D. 1995). Thus, the "primary rule" in interpreting such documents "is to ascertain the intent of the parties and to give effect to that intent." *Marshall*, 855 S.W.2d at 406. "Where there is no ambiguity in the contract, the intent of the parties is to be gathered from it alone and the court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language as there is nothing to construe." *Id.*

Therefore, to determine this point, we turn to the language of the declaration. With respect to the number and qualification of directors, the declaration at issue in this case provides as follows:

The Board shall consist of three (3) Directors.

9

(a)     Until October 1, 2016, all three directors shall be appointed by Declarant and may, but need not be, a member of the Association.

(b)     Upon Declarant voluntarily relinquishing its right of appointment or after October 1, 2016 whichever event first occurs, then all directors shall be elected annually by the Class B members at the annual meeting as set from time to time by the previous Board of Directors.

The declaration defines "Declarant" as Bayberry. Bayberry appointed Restelli, Lowe, and Fulton as directors in 2010. Consequently, the trial court did not err in finding Restelli, Lowe, and Fulton were properly exercising authority as directors of GPI.

In support of their argument to the contrary, the Hellmanns rely on *Forst v. Bohlman*, 870 S.W.2d 442 (Mo. App. E.D. 1994). *Forst* is not applicable here. The issue in *Forst* involved the rights of subsequent purchasers of the land. Here, in contrast, Bayberry was the original developer of the subdivision. The facts of *Forst* are not sufficiently similar to those in the present case for *Forst* to be controlling.

HCR also makes several arguments relevant to this point. First, HCR relies on the deposition testimony of Bob Van Stavern to support the contention that Bayberry "'washed [its] hands of the island' in April 2004." This argument ignores the standard of review. Because the trial court's conclusion that Bayberry had not voluntarily relinquished its right to appoint GPI's directors was contrary to Van Stavern's assertion, this Court must disregard Van Stavern's assertion. *See Ivie*, 439 S.W.3d at 200 ("Appellate courts 'accept as true the evidence and inferences . . . favorable to the trial court's decree and disregard all contrary

10

evidence.'") (quoting ***Zweig v. Metro St. Louis Sewer Dist.***, 412 S.W.3d 223, 231 (Mo. banc 2013)).

HCR next argues Bayberry voluntarily relinquished the right to appoint directors by divesting itself of all its property interests in the subdivision. However, selling the property did not automatically transfer Bayberry's rights as developer to the purchaser. "As a general proposition, 'the developer's rights of a platted subdivision are personal rights that do not run with the land.'" ***Woodglen***, 359 S.W.3d at 513 (quoting ***Scott v. Ranch Roy–L, Inc.***, 182 S.W.3d 627, 633 (Mo. App. E.D. 2005)). Those rights are assignable, but to be effective, the assignor must "manifest an intention to transfer the right to another person without further action or manifestation[.]" ***Id.*** (quoting ***Scott***, 182 S.W.3d at 634). Thus, Bayberry's sale of the land alone did not constitute voluntary relinquishment of its duties and rights as developer.

Furthermore, that Bayberry was administratively dissolved is not sufficient to meet the plain meaning of the term "voluntarily relinquishing." As stated above, interpretation of subdivision declarations is governed by the same rules as contract interpretation, ***Stolba***, 909 S.W.2d at 708, and generally speaking that means applying the plain meaning of the terms the parties used, ***Marshall***, 855 S.W.2d at 406. The plain and ordinary meaning of words may be derived from the dictionary. ***Bailey v. Federated Mut. Ins. Co.***, 152 S.W.3d 355, 357 (Mo. App. W.D. 2004). Voluntary means "proceeding from the will or from one's own choice or consent" while relinquish means "to withdraw or retreat from" or "to give over possession or control of[.]" Merriam-Webster's Collegiate Dictionary 1052, 1402 (11th ed. 2003). Bayberry was administratively dissolved

11

for failing to file annual reports. That is, Bayberry was dissolved by an action of the secretary of state, not by its "own choice and consent." Thus, the dissolution does not demonstrate Bayberry voluntarily relinquished its rights to appoint the directors of GPI.

Bayberry did not voluntarily relinquish its right to appoint directors of GPI, which was manifested by Bayberry appointing Restelli, Fulton, and Lowe to be directors of GPI. Restelli, Fulton, and Lowe did not need to be elected to act as directors, and Restelli's actions to reinstate GPI were authorized.

The Hellmanns' Points II, IV and V are denied.[3]

### Points Regarding the Interpretation of the Governing Documents

The next conceptually related group of points involves interpretation of the declaration and the bylaws. This group includes the Hellmanns' Point VIII, Point IX, Point X, Point XI, and Point XII as well as HCR's Point IV. In analyzing these points, we note that the declaration and the bylaws are essentially contracts, and that the general rules of contract interpretation apply. *See **Kehrs Mill Trails Assocs. v. Kingspointe Homeowner's Ass'n***, 251 S.W.3d 391, 396 (Mo. App. E.D. 2008); ***Blue Ridge Bank and Trust Co. v. Trosen***, 221 S.W.3d 451, 459 (Mo. App. W.D. 2007); ***Maryland Estates Homeowners' Ass'n v. Puckett***, 936 S.W.2d 218, 219 (Mo. App. E.D. 1996). "The primary rule of contract interpretation under Missouri law is that a court will seek to determine the parties' intent and give effect to that intent." ***Schler v. Coves***

---

[3] The Hellmanns' Point II is substantially the same as HCR's Point II as cross-appellant. HCR's Point II is denied for the same reason we deny the Hellmanns' Point II. The Hellmanns' fifth point is substantially the same as HCR's Point III as cross-appellant. HCR's Point III is denied for the same reasons we deny the Hellmanns' points four and five.

***North Homes Ass'n***, 426 S.W.3d 720, 723 (Mo. App. W.D. 2014). Generally, "[t]he parties' intent is determined by giving each term its plain, ordinary, and usual meaning." ***Id.*** "If the covenant is clear and unambiguous, the covenant is not subject to rules of construction, and intent is determined from the plain language of the covenant alone." ***Id.*** Furthermore, the interpretation of these documents must be guided by consideration of the purpose of the declaration. *See* ***Pioneer Point Homeowners Ass'n, Inc. v. Booth***, 179 S.W.3d 397, 402 (Mo. App. S.D. 2005) (quoting ***Sherwood Estates Homes Ass'n, Inc. v. Schmidt***, 592 S.W.2d 244, 247 (Mo. App. W.D. 1979)) ("the principle that restrictions as to the use of real property 'should be strictly construed' and 'doubts resolved in favor' of its free use 'should *never* be applied in such a way as to defeat the plain purpose of the restriction.'").

### The Assessments Were Valid

In their eighth point, the Hellmanns argue the trial court erred in finding GPI's assessments were authorized by the declaration. More specifically, the Hellmanns assert the declaration authorized assessments for facilities only, notes that GPI owned no property until 2011, and then concludes all the assessments were improper. This argument is without merit because it ignores the purpose and plain language of the declaration and the bylaws.

In Article I of the declaration, Bayberry stated its intention was "to develop a residential project on the Property to consist of residential facilities *and related recreational facilities* and amenities." (Emphasis added.) Bayberry's purpose in adopting the declaration also included "preventing any future impairment of the Property[.]" Article III of the declaration gave GPI the duty of governing the

13

facilities, and Article IV empowered GPI to levy assessments "for the purpose of operating, maintaining and improving the Facilities, whether presently existing or added hereafter[.]" The declaration defined the term facilities as "all items or things, whether real or personal that are now or hereafter owned in fee simple or leased by the Association, including, without limitation, roads, well and water facilities, park areas, services, sewage system and related services." In defining the board's powers to administer the facilities, the bylaws state the board may, among other things, "protect and defend in the name of the Association any part or all of the Facilities from loss and damage by suit or otherwise." Finally, Article V of the declaration governs easements and reservations. Among other things, section 7 of that article granted GPI:

> the concurrent right to establish from time to time, by declaration or otherwise, utility and other easements, permits, or licenses over the Common Areas, [f]or purposes including but not limited to streets, paths, walkways, drainage, recreation areas, parking areas, ducts, shafts, flues, conduit exceptions, and exclusions for the best interest of all the Owners within [the subdivision] as initially built and expanded.

When the provisions of the bylaws and the declaration are read in light of the purpose stated in Article I of the declaration, it is clear assessing fees to hire attorneys to protect the common areas for the use of the members was contemplated as an appropriate assessment. The purpose of the declaration is in part to prevent impairment of the subdivision property values and to provide common recreational elements for the owners in the subdivision. The community dock and the park property are clearly within the plain language of recreational elements. The dock lawsuit would, if undefended, have required removal of the community dock, which a majority of the members clearly

14

believed would have impaired their property values. Thus, payment of attorneys' fees and participation in the suit were necessary to protect the common recreational elements belonging to the subdivision. The assessments were valid under the plain language of the declaration and the bylaws.

The argument that GPI owned no property overlooks the use restrictions contained in the Hellmanns' deed to the park and the causeway. The declaration states that the term "facilities" includes real *or personal* property. Furthermore, according to the deed under which the Hellmanns received the park and the causeway, they took the property subject to "rights of others to use the causeway to the island as an easement for ingress and egress and use of Park area by other subdivision owners, their grantees, heirs, successors and assigns[.]" That is, the subdivision owners had an easement by virtue of their status as members of the subdivision. Furthermore, by the terms of the declaration, GPI had the right to create additional easements in the common areas. Easements are a form of property. *See St. Charles County v. Laclede Gas Co.*, 356 S.W.3d 137, 139 (Mo. banc 2011) ("Although an easement does not vest title, an easement is a form of private property"). GPI had property included in the definition of the term "facilities" in the form of an easement.

The trial court did not err in finding the assessments were valid. The Hellmanns' Point VIII is denied.[4]

---

[4] The Hellmanns' Point VIII is substantially the same as HCR's Point IV as cross-appellant. HCR's Point IV is denied for the same reasons we deny the Hellmanns' Point VIII.

### *The Hellmanns Are Entitled to Only Two Votes*

In their ninth point, the Hellmanns argue the trial court erred in ruling they are entitled to only two votes in governing GPI because the trial court improperly interpreted the meaning of the terms "lot," "parcel," and "designate." This argument ignores the plain meaning of the language in the declaration and the bylaws.

The following additional facts are relevant to the resolution of this claim. The GPI bylaws provide that "[a]t all meetings of the Association, a Lot, Tract or Parcel Owner or Owners shall be entitled to cast one (1) vote for each Lot, Tract or Parcel owned by him (them)." Article II of the bylaws defines "lot" as "a parcel of land designated as a lot, tract or unit on any plat of Grand Point Island or any portion thereof, and reserved for any purpose other than Facilities."

On the filed plat of the subdivision, the property owned by the Hellmanns is divided into five areas. These areas are labeled "cause-way," "park," "lot 1," "lot 12," and "lot 13." Later, a minor subdivision plat was filed which combined "lot 12" and "lot 13." The combined lot is now known as "lot 12" ("lot 12A"). The trial court accorded the Hellmanns one vote for lot 1 and one vote for lot 12A. The Hellmanns contest the trial court's ruling that they are not also entitled to two more votes, one each for the causeway and the park, claiming they are entitled to four votes instead of two.

The bylaws define the term "lot" as a parcel of land designated as a lot on the plat. Thus, resolution of this point requires examination of the term "designate." The verb "designate" is not defined in either the bylaws or the declaration. In such circumstances, "[t]he dictionary is a good source for finding

16

the plain and ordinary meaning of contract language." ***Kansas City University of Medicine and Biosciences v. Pletz***, 351 S.W.3d 254, 261 (Mo. App. W.D. 2011) (quoting ***Ferguson v. Gateway Ins. Co.***, 151 S.W.3d 911, 913 (Mo. App. W.D. 2004)). Designate is a verb meaning "to call by a distinctive title, term, or expression[.]" Merriam-Webster's Collegiate Dictionary 338 (11th ed 2003).

Here, as the trial court correctly found, the plat does not call the park and the causeway by the distinctive title "lot." Neither does it use the words "tract" or "unit." The causeway and park are not "designated as a lot, tract or unit on any plat of Grand Point Island[.]" Thus, they are not "lots" as that term is used in the provision according a vote for each lot.

In support of their argument to the contrary, the Hellmanns rely on an alternate dictionary definition of "designate" and the dictionary definition of "lot." This argument is without merit because it ignores the second portion of the definition of lot. *See **Blue Ridge Bank***, 221 S.W.3d at 459 (quoting ***State ex rel. Vincent v. Schneider***, 194 S.W.3d 853, 859 (Mo. banc 2006)) ("[c]ontract terms 'are read as a whole to determine the intention of the parties'"). The second part of the definition of "lot" provides that to be a lot, the piece of land must be "reserved for any purpose other than Facilities[.]" But the causeway and the park are specifically reserved as easements for the use of other owners for recreational purposes and to reach the community dock.

The Hellmanns' Point IX is denied.

17

### *The Community Dock Declarations Are Valid*

In Point X, the Hellmanns argue the trial court erred when it found the declaration regarding the community dock association was valid because the declaration imposed additional duties on the Hellmanns to which they did not agree. This argument is without merit because the Hellmanns manifested assent to community management of the community dock through their previous actions.

The following additional facts are relevant to the resolution of this point. Bayberry constructed the community dock as part of its initial development of the subdivision in 2000. The permit application submitted at that time described the structure as a "community dock for lot owners" in the subdivision. When the Hellmanns began negotiation to purchase property on the island, Hellmann was told the dock attached to the park was a community dock. At that time, Hellmann was also aware the subdivision had a set of restrictive covenants. The Hellmanns closed on their property during the spring of 2008. By the spring of 2011, the Hellmanns had acquired two slips in the community dock.

Thereafter, GPI held a meeting and adopted declarations for governing and maintaining the community dock. The Hellmanns voted against these resolutions.

In their seventh amended petition, the Hellmanns sought, *inter alia*, a declaratory judgment against GPI. The Hellmanns requested the trial court declare that the declaration of covenants for the community dock were unenforceable against the Hellmanns because the Hellmanns had not consented

18

to the declaration. The trial court found the declaration for the community dock was enforceable against the Hellmanns.

The trial court did not err in finding the declaration for the community dock was enforceable against the Hellmanns because the Hellmanns manifested their assent to community management of the community dock when they purchased two slips knowing that the dock was a community dock owned by another entity. One of the ways a developer may create a binding restrictive covenant is "by developing and selling the land pursuant to a common plan or scheme of improvement." **Wheeler v. Sweezer**, 65 S.W.3d 565, 569 (Mo. App. W.D. 2002). Furthermore, such covenants may be enforced against an owner "who has actual or constructive notice of the restrictions." **Id.**

Here, the circumstances surrounding the Hellmanns' purchase of their property and the slips in the community dock show they had knowledge that implied restrictions applied to the community dock. The community dock was built several years before the Hellmanns purchased their property. It was always designated as a community dock. When the Hellmanns negotiated the purchase of their property, they saw the community dock and were informed that it was a community dock. The Hellmanns were also aware that restrictions governed the subdivision. After obtaining that knowledge, the Hellmanns acquired two slips in the dock. The Hellmanns' assent to community government of the dock can be inferred from these facts.

The problem with the Hellmanns' arguments to the contrary is that they focus on the wrong time period. The Hellmanns argue they did not agree to the declaration GPI created because they voted against it. This focus allows them to

19

discount the import of their actions when they acquired the property. When they acquired their property and the dock slips, they knew the property was subject to restrictions and that the dock was a community dock.

The Hellmanns' Point X is denied.

### *The Bylaws and Declarations Were Not Amended*

In their eleventh point, the Hellmanns argue the trial court erred in finding the March 2011 proxy votes were not an amendment to the declaration. This argument fails because the March 2011 proxy votes did not broaden the purpose of the assessments or expand the definition of facilities.

The following additional facts are relevant to the resolution of this point. GPI held a meeting in March 2011. One of the topics of discussion at that meeting was the use of the park. At that meeting, the members of GPI voted to approve several items. Among those items were (1) an acknowledgment that the term "facilities" included the park and the community dock and (2) an acknowledgment that GPI could charge assessments to cover the cost of litigation. The Hellmanns and HCR voted no on those items, while all the other members voted yes.

The trial court denied the Hellmanns' claim that these votes were ineffective, stating there was never an attempt to amend the declaration. The trial court noted the items were not described as amendments. More specifically, the trial court stated, "there is no evidence to support the Hellmanns' contentions that the items voted on during the March 2011 meeting were, in form or substance, amendments to the Declaration."

In the present case, the declarations stated the purpose of the restrictions was to maintain the value of the property and to provide attractive residential areas with associated recreational facilities. The definition of common area included property held "for the common use and enjoyment of all the Members." The applicable deed reserved the park for the use of all the lot owners in the subdivision. Thus, the plain meaning of the definition of "Common Area" in the declaration included the park. The trial court did not err in finding the March 2011 vote did not constitute an amendment of the declaration.

The Hellmanns' Point XI is denied.

### The Design Review Committee

In Point XII, the Hellmanns argue the trial court erred when it found the requirement of approval by the design review committee of plans for improvements on the island had not been waived. This argument is moot because there has been no attempt to enforce the design review committee provisions.

Although neither of the parties addresses the issue, the issue of mootness is a legal issue Missouri appellate courts will raise *sua sponte*. **STRUCE, Inc. v. Potts**, 386 S.W.3d 214, 218 (Mo. App. W.D. 2012). "With regard to justiciability, a case is moot if a judgment rendered has no practical effect upon an existent controversy." **Autumn Ridge Homeowners Ass'n, Inc. v. Occhipinto**, 311 S.W.3d 415, 420 (Mo. App. W.D. 2010) (quoting **State ex rel. Chastain v. City of Kansas City**, 968 S.W.2d 232, 237 (Mo. App. W.D. 1998)). Furthermore, appellate courts will "not decide questions of law disconnected from the granting of actual relief." **Id.** (quoting **Chastain**, 968 S.W.2d at 237).

21

Such issues "do not present an issue for appellate review because any opinion addressing surplus conclusions would be merely advisory." *Id.* (quoting *Craft v. Phillip Morris Cos.*, 190 S.W.3d 368, 378 (Mo. App. E.D. 2005)).  Thus, if a challenged finding does not affect the practical effect of the trial court's judgment, a point on appeal regarding that finding will not be addressed.

Here, the trial court's statement in the judgment regarding the design review committee was not necessary to the relief requested by the parties.  In the present case the primary issues involved (1) the identity of the members of the GPI board of directors; (2) the organizational structure of GPI; (3) the validity of the assessments GPI charged; and (4) the validity of the alleged agreement to relocate the community dock.  There is no allegation that the design review committee unreasonably failed to approve plans or that a structure should be removed because approval from the design review committee had not been obtained.  Rather, the Hellmanns are simply requesting a declaration that the design review committee provisions do not apply in the abstract.  Such a declaration would amount to an advisory opinion as it would have no effect on the rights and liabilities associated with a currently existing dispute.

The Hellmanns' Point XII is denied.

**Points Regarding the Agreement to Move the Community Dock**

The Hellmanns' Point XIII, Point XIV, Point XV, Point XVI, and Point XVII are devoted to the trial court's refusal to enforce the alleged agreement to relocate the community dock.  Additionally, each of the three points raised by the Bulls as cross appellants is related to the easement associated with the

community dock. These points all fail because the alleged agreement to relocate the community dock was rescinded.

The following additional facts are necessary to the resolution of these points. In 2004, Care acquired several lots in the subdivision. Randall Kent ("Kent"), a member of Care, also purchased two lots in his individual capacity.

In the fall of 2006, Kent developed an idea to move the community dock from the park to lot 3 which was owned by Care. Kent discussed the idea with Restelli who was the only other full-time resident of the island at that time. Relocating the community dock would provide a wave break for Restelli's dock, and it would create space for Kent to attach his personal dock to the park so Kent's personal dock would be closer to lots 12 and 13 on which Kent planned to build a home. Four of the owners on the island, including Randall Sparks ("Sparks") and a representative of Ozark BF, LLC ("Ozark"), signed documents stating they had no interest in the park and they gave "permission to move the community dock from the 'Park' to the legal easement located between lots 2 and 3."

Meanwhile, Care agreed to sell lot 3 to Michael Franklin ("Franklin"). The contract for this sale ("the Franklin contract") provided that two boat slips in the community dock were to be conveyed with the land. In a paragraph labeled special agreements, the Franklin contract went on to state, "[b]uyer hereby agrees that the community boat dock will be placed between lots 2 and 3 GPI. Buyer agrees to install seawall on Lot 3 GPI. Buyer to have approval on the specifications of the sidewalk installed between Lots 2 and 3."

23

On September 10, 2006, Care entered into a separate sale agreement with Sparks ("the Sparks contract") to sell lots 4 and 5 to Sparks. Like the Franklin contract, the Sparks contract contained an addendum regarding the community dock. The addendum provided that Sparks would be responsible for installing a sidewalk between lots 2 and 3 while Care would "be responsible for the move and installation of the community dock between Lots 2 and 3 GPI."

The sale to Franklin took place on September 30, 2006. The sale to Sparks took place on October 13, 2006.

The situation began to change that winter. In November 2006, Kent sold lot 8 to Lowe. At the time of the sale, Kent told Lowe "the community dock would be accessible via the park which was common ground." Lowe was not asked to sign a waiver of interest "or any other type of document consenting to the dock relocation." Kent did not tell Lowe about any plan to move the community dock.

In early 2007, Franklin constructed a foundation for his home on lot 3. After Franklin built his home, it was no longer possible to create a reasonable access for the community dock from lot 3. As a result, Care had difficulty selling additional dock slips. Some of the other homeowners stated they would sue if Care moved the dock. Kent and Sparks believed it was no longer possible to move the community dock, so they agreed "the deal was off[.]" That information was conveyed to Franklin and Ozark.

In early 2008, the Hellmanns began negotiating with Care to purchase a number of lots on the island. The first contract between the Hellmanns and Care required Care to complete the relocation of the community dock before closing. Prior to closing, Kent received information that Ozark would sue if the

community dock was moved. Care sent an email to the agent at the title insurance company informing her the deal would be put on hold. On the appointed closing date, Kent did not appear on behalf of Care. The Hellmanns sued Care and filed a *lis pendens* regarding the property. Care and the Hellmanns then entered into a second contract. The second contract did not require relocation of the community dock prior to closing.

The Hellmanns then purchased lots 1, 12, and 13, as well as the park and the causeway from Care on April 19, 2008. The warranty deed for the park and the causeway reserved the rights of the other owners to use the park and the causeway. On that same day, Kent also executed an assignment. That assignment transferred to the Hellmanns, among other things, "[a]ll rights under certain owner consents for lots 4, 5, 6, 7, and 9 of Grand Pointe Island, a subdivision in Camden County, Missouri, allowing the moving of the dock presently attached to the Park Lot[,]" and "[a]ll rights pursuant to an agreement with Pete Franklin to move the dock presently attached to the Park Lot to Lot 3, the lot owned by Pete Franklin[.]" Nevertheless, the assignment explicitly stated, "[a]ssignor specifically makes no representations with respect to the validity or the enforceability of any rights being assigned to [a]ssignee."

In December 2011, Franklin's lender, Hawthorn Bank ("Hawthorn"), began foreclosure proceedings on lot 3. The Hellmanns sued Franklin and Hawthorn seeking specific performance of the agreement to move the community dock and an injunction on the foreclosure until Hawthorn executed an agreement subordinating its lien on lot 3 to the easement on lot 3. The parties to that lawsuit reached a settlement. As part of the settlement, the Franklins granted an

25

easement on their property for the purpose of attaching the community dock and for access to the community dock. The easement was conditional on the result of the litigation in this case and provided the easement would lapse if a final judgment was entered stating there was no agreement to move the community dock.

Ozark sued the Hellmanns and others seeking an injunction to prevent the removal of the community dock from the park. The Hellmanns counterclaimed seeking a declaration that the other lot owners had no right to use the park and that there was a valid and binding agreement to relocate the community dock. They also sought a mandatory injunction requiring the community dock to be moved to lot 3 and specific performance of the Franklin contract. After a three-day trial, the trial court found there was no binding agreement to relocate the community dock and denied the Hellmanns' claims requesting specific performance and a mandatory injunction.

### The Agreement to Move the Community Dock Was Rescinded

The trial court's determination that there was no agreement to relocate the community dock was correct because the parties to the original agreement to move the community dock had mutually rescinded that agreement *prior* to the time the Hellmanns received their assignment of Care's rights under those contracts. "A written contract may be rescinded or abandoned by an agreement, either written or parol, of the parties to the contract." ***Tahan v. Garrick, Inc.***, 701 S.W.2d 189, 191 (Mo. App. E.D. 1985). "Such rescission may be shown by acts and declarations of the parties which are inconsistent with the continued existence of the previous contract." ***Id.***

26

Here, not only did the parties on both sides of the agreement take actions and make statements inconsistent with the continued existence of an agreement to move the community dock, there was an explicit agreement to abandon the agreement to move the community dock.  In November 2006, Kent sold property in the subdivision to Lowe.  During the negotiations prior to that sale, Kent did not mention the agreement to move the community dock, even though that agreement, if still effective, would have affected the rights associated with the lot Lowe purchased.   In early 2007, Franklin built his home in a location on his lot that made construction of an access for the community dock unrealistic if not impossible.  The choice to build a home in that location supports the conclusion that there was no longer an agreement to move the community dock.  Then, based on complications caused by Franklin's choice, Kent and Sparks discussed the situation and decided "the deal was off[.]"  That conversation constituted an explicit oral agreement to rescind the agreement to move the community dock.

Additionally, when the removal of the community dock was made a condition of the Hellmanns' first contract in 2008, Kent could not accomplish it, and the contract failed to close.  Even at that point, Kent took no action to attempt to enforce the agreement to move the community dock.  These facts show Kent, Franklin, and Sparks rescinded the agreement to move the community dock to lot 3.

The rescission of the contract renders moot any further discussion of the Hellmanns' points regarding the agreement.  This is because, "[a]s a general rule, rescission of a contract does not merely terminate it, but abrogates it in toto." ***Dilts v. Lynch***, 655 S.W.2d 118, 121 (Mo. App. S.D. 1983).  Furthermore, the

27

Hellmanns' rights with respect to the agreement to relocate the community dock stem from an assignment they received from Kent. "An assignee steps into the shoes of its assignor; it acquires no greater rights than those held by the assignor at the time of the assignment." *Adams v. Cossa*, 294 S.W.3d 101, 105 (Mo. App. E.D. 2009). That is, "[t]he only rights or interests an assignee acquires are those the assignor had *at the time the assignment was made.*" *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 128 (Mo. banc 2010) (emphasis added). Thus, if an agreement has been cancelled prior to an assignment, one who takes an assignment of that agreement acquires nothing. *See Stone v. Farm Bureau Town & Country Ins. Co.*, 203 S.W.3d 736, 744 n.5 (Mo. App. S.D. 2006). At the time the Hellmanns purchased the property and Kent made the assignment of his rights under the agreement to relocate the community dock, the agreement to relocate the community dock had already been rescinded. Consequently, it was as if the agreement had never existed, and there was nothing to transfer to the Hellmanns.

The rescission of the agreement to relocate the community dock also defeats the Hellmanns' claims regarding the easement on lot 3 because the easement on lot 3 was expressly conditioned upon the relocation of the community dock. When interpreting the provisions of a written grant of an easement, Missouri courts look to the parties' intentions "to be ascertained within the four corners of the instrument, the surrounding circumstances and conditions." *Jablonowski v. Logan*, 169 S.W.3d 128, 131 (Mo. App. E.D. 2005). Furthermore, "an easement can be granted to be terminated on condition[.]" *University City v. Chicago, R. I. & P. Ry. Co.*, 149 S.W.2d

28

321, 326 (Mo. 1941). Here, the easement was created to settle litigation regarding the alleged agreement to relocate the community dock. Additionally, the language of the recorded instrument granting the easement explicitly stated that if a court ordered that the community dock would not be relocated, "then the easement granted herein shall lapse." Thus, once it is determined that there is no enforceable agreement to relocate the community dock, the easement is extinguished by its own terms.

This conclusion also disposes of the points raised in the Bulls' cross-appeal. In each of their three points as cross-appellants, the Bulls present additional reasons why the trial court should have found it was impossible to construct the sidewalk in the easement on lot 3. Because the agreement to relocate the community dock was rescinded and the easement lapsed, these points are moot.

The original parties to the agreement to relocate the community dock rescinded their agreement. Thus, the trial court did not err in determining there was no enforceable agreement to relocate the community dock. The Hellmanns' Point XIII, Point XIV, Point XV, Point XVI, and Point XVII as well as the Bulls' Point I, Point II, and Point III are denied.

## Points Regarding the Appointment of an Attorney

The final group of points includes the Hellmanns' Point VI and Point VII, in which the Hellmanns challenge the trial court's rulings regarding attorney Michael McDorman ("McDorman"). The following additional facts are relevant to the resolution of these two points.

In February 2011, after the lawsuit had been pending for almost three years, the trial court held a hearing and then made a docket entry regarding additional parties. The Hellmanns' attorney was given 14 days to file an amended petition which included all parties. Later that summer, trial was scheduled for December 2011.

On September 6, 2011, the Hellmanns filed a motion to add additional parties. Again, the trial court held a hearing to determine whether all parties had been named in the lawsuit. After that hearing, the trial court noted in a docket entry that "parties agree a GAL should be appointed for all unknown heirs. Parties agree to appoint Attorney Michael McDorman, Plaintiff to deposit $2000.00 with the GAL."

On November 16, the Hellmanns filed a motion to strike the appointment of McDorman. In that motion, the Hellmanns argued the trial court had no authority to appoint McDorman because there was no statute or rule authorizing the appointment. The trial court overruled the motion, noting the case had been continued three times while the parties attempted to identify all interested persons. The case was finally tried in September 2012, and McDorman attended and participated in the three day trial.

After trial, McDorman submitted a bill to the judge with an explanatory email. The email stated McDorman anticipated spending additional time on the matter to review the proposed findings of fact and conclusions of law submitted by the parties and to perhaps draft his own proposed findings of fact and conclusions of law if the positions taken by the other parties did not incorporate all of his concerns. The statements attached to the email billed 68.8 hours of

30

attorney time. After mileage and other expenses were included, the total bill came to $17,232.55.

In its original judgment, the trial court made factual findings regarding the necessity of appointing McDorman. The trial court noted the complexity of the case and the trial court's orders trying to get the Hellmanns to join all interested parties. The trial court also considered the Hellmanns' conduct at trial and the fact that "[p]rior to purchasing their lot, the [Hellmanns] were aware that the project to move the dock had been abandoned by all lot owners." The trial court concluded it had the power to appoint an attorney for unknown parties in a declaratory judgment action and ordered the Hellmanns to pay $19,857.55 in fees to McDorman.

The Hellmanns timely filed a motion for new trial or to amend the judgment. Among other things, the Hellmanns argued the award of fees to McDorman was improper because it was more than McDorman requested.

The trial court thereafter entered an amended judgment. The findings regarding McDorman were identical to those in the original judgment, but the amount of attorney's fees awarded was increased to $20,000.00.

### *Invited Error*

In Point VI, the Hellmanns argue "[t]he trial court erred in appointing attorney McDorman to represent 'unknown persons' and ordering the Hellmanns to pay all of the fees for attorney McDorman" because the trial court lacked jurisdiction to do so as "there is no rule or statute or other authorizing law that provides the authority for the trial court to take these actions." The record created below suggests the Hellmanns invited this error.

31

"The general rule of law is that a party may not invite error and then complain on appeal that the error invited was in fact made." ***Pierson v. Kirkpatrick***, 357 S.W.3d 293, 299 (Mo. App. S.D. 2012) (quoting ***Lau v. Pugh***, 299 S.W.3d 740, 757 (Mo. App. S.D. 2009)).  Thus, "[u]nder the invited error rule, 'a party is estopped from complaining of an error of his own creation, and committed at his request.'" ***G.H. v. Eli Lilly & Co.***, 412 S.W.3d 326, 332 (Mo. App. W.D. 2013) (internal citation omitted).

In the present case, the initial docket entry regarding McDorman stated the parties agreed to have a guardian ad litem appointed for "unknown heirs."  It was not until over a month later that the Hellmanns objected to the appointment.  Under these circumstances, the Hellmanns invited the error of which they now complain.

The Hellmanns' Point VI is denied.

### Attorney's Fees

In their seventh point, the Hellmanns argue the trial court's award of fees to McDorman was not supported by substantial evidence and was against the weight of the evidence because the amount awarded was more than the amount McDorman requested.  We disagree.

McDorman's bill and the letter accompanying it show the award was reasonable.[5]  "[T]he trial court is considered an expert on the issue of attorneys'

---

[5] These documents do not appear in the legal file and were not provided as an exhibit on appeal.  Rather, the documents are available only in the appendix to the Hellmanns' brief.  Generally speaking, merely including a document or exhibit in an appendix to a brief does not make them part of the record on appeal. ***Evans v. FirstFleet, Inc.***, 345 S.W.3d 297, 306 (Mo. App. S.D. 2011).  Nevertheless, "[w]here a statement of fact is asserted in one party's brief and conceded to be true in the adversary's brief, we may consider it as though it appears in the record." ***Eskridge v. State***, 193 S.W.3d 849, 852 (Mo. App. S.D. 2006) (quoting ***Thornbury v. Morris Oil Co.,***

fees such that, in the absence of a contrary showing, the trial court is presumed to know the character of the attorneys' services rendered in duration, zeal, and ability." *Grissom v. First Nat. Ins. Agency*, 364 S.W.3d 728, 736 (Mo. App. S.D. 2012) (quoting *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 878 (Mo. App. E.D. 2009)).  In fact, because of its expertise, "[t]he circuit court that 'tries a case and is acquainted with all the issues involved may "fix the amount of attorneys' fees without the aid of evidence."'" *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 23 (Mo. banc 2012) (quoting *Essex Contracting, Inc. v. Jefferson County*, 277 S.W.3d 647, 656 (Mo. banc 2009)).  When fixing the amount of attorneys' fees, the trial court may consider many factors, including:

> 1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; 2) the number of hours reasonably expended on the litigation; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition.

*Berry v. Volkswagen Group of America, Inc.*, 397 S.W.3d 425, 431 (Mo. banc 2013) (quoting *Hill v. City of St. Louis*, 371 S.W.3d 66, 81-82 (Mo. App. E.D. 2012)).

In the present case, the trial judge who set the amount of attorney's fees in this case was also the judge who appointed McDorman and presided over the trial.  Thus, he was familiar with the work McDorman performed in the case. Additionally, McDorman submitted a bill in the amount of $17,232.55.

---

*Inc.*, 846 S.W.2d 238, 239 n. 2 (Mo. App. S.D. 1993)).  Here, all parties who discuss this issue refer to the email and the bill in their briefs and appear to agree about the amount stated in the bill.  Thus, we accept those statements as if they appeared in the record.

McDorman also noted he would be expending additional time in the case to review the parties' proposed findings of fact and conclusions of law. In light of the number of parties and complexity of the case, the trial court did not abuse its discretion in providing additional fees for that work.

In support of their argument to the contrary, the Hellmanns rely on *Dildine v. Frichtel*, 890 S.W.2d 683 (Mo. App. E.D. 1994), for the proposition that the trial court abuses its discretion in setting attorney fees where there is no evidence to support the award. This argument is without merit. That case involved a jury award of attorney fees. *Id.* at 684-85. Members of a jury, unlike a trial judge, are not experts in attorney fees. *Id.* at 687. Furthermore, as discussed above, there is evidence to support the trial court's ruling because McDorman stated he would be doing additional work on the case that was not reflected in the bills submitted.

The trial court did not abuse its discretion when it set the amount of attorney's fees to be awarded to McDorman. The Hellmanns' Point VII is denied.

### Decision

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – CONCURS

DON E. BURRELL, J. – CONCURS